**E-FILED**
Wednesday, 14 October, 2015  03:27:38 PM
Clerk, U.S. District Court, ILCD

STATE OF ILLINOIS      )
                      ) SS
COUNTY OF MARSHALL )

## IN THE CIRCUIT COURT OF THE TENTH JUDICIAL CIRCUIT
## MARSHALL COUNTY, ILLINOIS

GHEORGHE CIOCAN,                                   )
                                       )
          PLAINTIFF,                         )
                                       )
VS.                                                               )
                                       )   CASE NO: 15-L-11
RICARDO GABRIEL JIMINEZ, individually  )
and as agent of WARREN TRANSPORT, INC.,  )
and WARREN TRANSPORT, INC., individually, )  Please Serve: Warren Transport, Inc.
                                       )                  R/A: Patrick Smyth
          DEFENDANTS.                      )                  105 W. Madison, #901
                                                Chicago, Illinois 60602

### SUMMONS

To each Defendant:

    YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at 122 North Prairie, Lacon, Illinois 61540.

    You must file within 30 days after service of this Summons, not counting the day of service. IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.

To the officer:

    This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than 30 days after its date.

ARDC NUMBER: 6275967
SCOTT SPIEGEL
SPIEGEL & DEMARS
19 S. LASALLE STREET, SUITE 902
CHICAGO, THIS CASE IS SET FOR A CASE MANAGEMENT
                  CONFERENCE AT 9:30 A.M. ON
(312) 726-3377
(312) 782-1366 (fax)

FEB 1 0 2016

IF DEFENDANT ANSWERS MORE THAN 35 DAYS
BEFORE THIS DATE, THE PARTIES SHALL
SCHEDULE A CASE MANAGEMENT
CONFERENCE WITHIN 35 DAYS OF THE
DATE THE ANSWER IS FILED

WITNESS August 28, 2015



                        Clerk of Court

Date of Service: _____
(to be inserted by officer on copy left with
defendant or other person)



EXHIBIT
A

FILED
CIRCUIT COURT MARSHALL COUNTY, IL

COPY

**STATE OF ILLINOIS** )
) SS
**COUNTY OF MARSHALL** )

AUG 2 8 2015

CLERK OF THE CIRCUIT COURT

THIS CASE IS SET FOR A CASE MANAGEMENT
CONFERENCE AT 9:30 A.M. ON

IN THE CIRCUIT COURT OF THE TENTH JUDICIAL CIRCUIT
MARSHALL COUNTY, ILLINOIS

**FEB 1 0 2016**

IF DEFENDANT ANSWERS MORE THAN 35 DAYS
BEFORE THIS DATE, THE PARTIES SHALL
SCHEDULE A CASE MANAGEMENT
CONFERENCE WITHIN 35 DAYS OF THE
DATE THE ANSWER IS FILED

**GHEORGHE CIOCAN,** )
)
**PLAINTIFF,** )
)
**VS.** )
)
**RICARDO GABRIEL JIMINEZ, individually** )
**and as agent of WARREN TRANSPORT, INC.,** )
**and WARREN TRANSPORT, INC., individually,** )
)
**DEFENDANTS.** )

CASE NO: 15- L -11

## COMPLAINT AT LAW

NOW COMES the Plaintiff, GHEORGHE CIOCAN, by and through his attorneys,
SPIEGEL & DEMARS, who complain of the Defendants, RICARDO GABRIEL JIMINEZ,
individually and as agent of WARREN TRANSPORT, INC., and WARREN TRANSPORT, INC.,
individually, as follows:

## COUNT I

For his cause of action against RICARDO GABRIEL JIMINEZ, the Plaintiff, GHEORGHE
CIOCAN, states as follows:

1)      On March 10, 2014, Interstate 39 was a public highway running in a northerly and
southerly direction at or near a location approximately 902 feet south of Mile Post 31 in Bennington
Township in the County of Marshall and State of Illinois.

2)      At the time and place aforesaid the Plaintiff, GHEORGHE CIOCAN, operated a
vehicle in a southerly direction on Interstate 39 at or near a location approximately 902 feet south of
Mile Post 31, in the Township, County and State aforesaid.

1

3)     At the time and place aforesaid, the Defendant, RICARDO GABRIEL JIMINEZ, operated a motor vehicle in a southerly direction on Interstate 39 at or near a location approximately 902 feet south of Mile Post 31, in the Township, County and State aforesaid, and that vehicle was owned, managed, maintained, supervised, and/or controlled by the Defendant, RICARDO GABRIEL JIMINEZ.

4)     At all times mentioned herein the Defendant, RICARDO GABRIEL JIMINEZ, had the duty in the maintenance and operation of said vehicle to exercise ordinary care to avoid injury to persons lawfully upon the thoroughfare, including the Plaintiff.

5)     At the time and place aforesaid the Defendant, RICARDO GABRIEL JIMINEZ, breached his aforementioned duty in one or more of the following ways:

a)  Carelessly and negligently operated, managed, maintained and controlled said vehicle;

b)  Carelessly and negligently operated said motor vehicle at rate of speed that was greater than reasonable and proper with regard to traffic conditions and the use of the highway, contrary to, and in violation of, the provisions of 625 ILCS 5/11-601(a) of the Illinois Revised Statutes;

c)  Carelessly and negligently operated said motor vehicle without keeping a proper and sufficient lookout for other vehicles in and about the area, and specifically for the motor vehicle operated by the Plaintiff;

d)  Carelessly and negligently failed to operate his motor vehicle entirely within a single lane without first ascertaining that such movement could be made safely, contrary to, and in violation of the provisions of 625 ILCS 5/11-709 of the Illinois Revised Statutes;

e)  Carelessly and negligently changed from one lane to another without first ascertaining that such movement could be done safely, contrary to and in violation of the provisions of 625 ILCS 5/11-709(a) of the Illinois Revised Statutes;

f)  Carelessly and negligently followed the motor vehicle operated by the Plaintiff more closely than was reasonable and prudent, without having due regard for the speed of such vehicle and the traffic upon, and the condition of, the highway, contrary to, and in violation of, the provisions

of 625 ILCS 5/11-710(a) of the Illinois Revised Statutes;

g) Carelessly and negligently failed to have said motor vehicle equipped with proper and sufficient brakes, contrary to, and in violation of, the provisions of 625 ILCS 5/12-301(a) of the Illinois Revised Statutes;

h) Carelessly and negligently failed to give audible and proper warning of the approach of said motor vehicle, although such warning was necessary to insure the safe operation of said vehicle contrary to, and in violation of, the provisions of 625 ILCS 5/12-601(a) of the Illinois Revised Statutes;

i) Carelessly and negligently failed to maintain proper control over said motor vehicle at all times;

j) Carelessly and negligently failed to stop said motor vehicle when danger was imminent so as to avoid striking the Plaintiff's vehicle;

k) Carelessly and negligently failed to change the course of said motor vehicle so as to avoid striking the Plaintiff's vehicle; and/or

l) Otherwise carelessly, negligently and improperly drove and operated said motor vehicle.

6)    As a direct and proximate result of one or more of the aforesaid careless and negligent acts, the vehicle being operated by the Defendant, RICARDO GABRIEL JIMINEZ, collided with the vehicle operated by the Plaintiff, GHEORGHE CIOCAN, and as a direct and proximate result of that collision the Plaintiff, GHEORGHE CIOCAN, suffered serious bodily injury, both internally and externally, and he suffered a severe shock to his nervous system, and became sick and disabled, and will continue to suffer great pain, discomfort and physical impairment; and his said injuries required hospitalization and medical treatment, all of which said injuries are permanent; and he has been kept from attending to his ordinary affairs and duties; and he has lost large gains, and has become obligated for large sums of money for medical and hospital care and attention.

WHEREFORE the Plaintiff, GHEORGHE CIOCAN, prays for judgment against the Defendant, RICARDO GABRIEL JIMINEZ, in an amount greater than FIFTY THOUSAND DOLLARS ($50,000.00) as will fairly, reasonably and adequately compensate him for his injuries and damages, together with his costs in bringing this suit.

## COUNT II

For his cause of action against RICARDO GABRIEL JIMINEZ as agent of WARREN TRANSPORT, INC., the Plaintiff, GHEORGHE CIOCAN, states as follows;

1)   On March 10, 2014, Interstate 39 was a public highway running in a northerly and southerly direction at or near a location approximately 902 feet south of Mile Post 31 in Bennington Township in the County of Marshall and State of Illinois.

2)   At the time and place aforesaid the Plaintiff, GHEORGHE CIOCAN, operated a vehicle in a southerly direction on Interstate 39 at or near a location approximately 902 feet south of Mile Post 31, in the Township, County and State aforesaid.

3)   At the time and place aforesaid, the Defendant, RICARDO GABRIEL JIMINEZ, operated a motor vehicle in a southerly direction on Interstate 39 at or near a location approximately 902 feet south of Mile Post 31, in the Township, County and State aforesaid, and that vehicle was owned, managed, maintained, supervised, and/or controlled by the Defendant, WARREN TRANSPORT, INC.

4)   At all relevant times herein, the Defendant, RICARDO GABRIEL JIMINEZ, operated said vehicle with the permission of the Defendant, WARREN TRANSPORT, INC.

5)   At all relevant times herein, the Defendant, RICARDO GABRIEL JIMINEZ, was an agent and/or employee of the Defendant, WARREN TRANSPORT, INC., and was driving said vehicle in the course of, and within the scope of, said agency and/or employment.

4

6)     At all times mentioned herein the Defendant, RICARDO GABRIEL JIMINEZ as agent of WARRANT TRANSPORT, INC. had the duty in the maintenance and operation of said vehicle to exercise ordinary care to avoid injury to persons lawfully upon the thoroughfare, including the Plaintiff.

7)     At the time and place aforesaid the Defendant, RICARDO GABRIEL JIMINEZ as agent of WARRANT TRANSPORT, INC. breached his aforementioned duty in one or more of the following ways:

a) Carelessly and negligently operated, managed, maintained and controlled said vehicle;

b) Carelessly and negligently operated said motor vehicle at rate of speed that was greater than reasonable and proper with regard to traffic conditions and the use of the highway, contrary to, and in violation of, the provisions of 625 ILCS 5/11-601(a) of the Illinois Revised Statutes;

c) Carelessly and negligently operated said motor vehicle without keeping a proper and sufficient lookout for other vehicles in and about the area, and specifically for the motor vehicle operated by the Plaintiff;

d) Carelessly and negligently failed to operate his motor vehicle entirely within a single lane without first ascertaining that such movement could be made safely, contrary to, and in violation of the provisions of 625 ILCS 5/11-709 of the Illinois Revised Statutes;

e) Carelessly and negligently changed from one lane to another without first ascertaining that such movement could be done safely, contrary to and in violation of the provisions of 625 ILCS 5/11-709(a) of the Illinois Revised Statutes;

f) Carelessly and negligently failed to have said motor vehicle equipped with proper and sufficient brakes, contrary to, and in violation of, the provisions of 625 ILCS 5/12-301(a) of the Illinois Revised Statutes;

g) Carelessly and negligently failed to give audible and proper warning of the approach of said motor vehicle, although such warning was necessary to insure the safe operation of said vehicle contrary to, and in violation of, the provisions of 625 ILCS 5/12-601(a) of the Illinois Revised Statutes;

h) Carelessly and negligently failed to maintain proper control over said motor vehicle at all times;

i) Carelessly and negligently failed to stop said motor vehicle when danger was imminent so as to avoid striking the Plaintiff's vehicle;

j) Carelessly and negligently failed to change the course of said motor vehicle so as to avoid striking the Plaintiff's vehicle; and/or

k) Otherwise carelessly, negligently and improperly drove and operated said motor vehicle.

8)    As a direct and proximate result of one or more of the aforesaid careless and negligent acts, the vehicle being operated by the Defendant, RICARDO GABRIEL JIMINEZ, collided with the vehicle operated by the Plaintiff, GHEORGHE CIOCAN, and as a direct and proximate result of that collision the Plaintiff, GHEORGHE CIOCAN, suffered serious bodily injury, both internally and externally, and he suffered a severe shock to his nervous system, and became sick and disabled, and will continue to suffer great pain, discomfort and physical impairment; and his said injuries required hospitalization and medical treatment, all of which said injuries are permanent; and he has been kept from attending to his ordinary affairs and duties; and he has lost large gains, and has become obligated for large sums of money for medical and hospital care and attention.

WHEREFORE the Plaintiff, GHEORGHE CIOCAN, prays for judgment against the Defendant, RICARDO GABRIEL JIMINEZ as agent of WARREN TRANSPORT, INC., in an amount greater than FIFTY THOUSAND DOLLARS ($50,000.00) as will fairly, reasonably and adequately compensate him for his injuries and damages, together with his costs in bringing this suit.

## COUNT III

For his cause of action against WARREN TRANSPORT, INC., the Plaintiff, GHEORGHE CIOCAN, states as follows;

1)      On March 10, 2014, Interstate 39 was a public highway running in a northerly and southerly direction at or near a location approximately 902 feet south of Mile Post 31 in Bennington Township in the County of Marshall and State of Illinois.

2)      At the time and place aforesaid the Plaintiff, GHEORGHE CIOCAN, operated a vehicle in a southerly direction on Interstate 39 at or near a location approximately 902 feet south of Mile Post 31, in the Township, County and State aforesaid.

3)      At the time and place aforesaid, the Defendant, RICARDO GABRIEL JIMINEZ, operated a motor vehicle in a southerly direction on Interstate 39 at or near a location approximately 902 feet south of Mile Post 31, in the Township, County and State aforesaid, and that vehicle was owned, managed, maintained, supervised, and/or controlled by the Defendant, WARREN TRANSPORT, INC.

4)      At all relevant times herein, the Defendant, RICARDO GABRIEL JIMINEZ, operated said vehicle with the permission of the Defendant, WARREN TRANSPORT, INC.

5)      At all relevant times herein, the Defendant, RICARDO GABRIEL JIMINEZ, was an agent and/or employee of the Defendant, WARREN TRANSPORT, INC., and was driving said vehicle in the course of, and within the scope of, said agency and/or employment.

6)      At all times mentioned herein, the Defendant, WARREN TRANSPORT, INC., by and through its duly authorized agent, RICARDO GABRIEL JIMINEZ, had the duty in the maintenance and operation of said vehicle to exercise ordinary care and caution to avoid injury to persons lawfully upon the thoroughfare, including the Plaintiff.

7)     At the time and place aforesaid, the Defendant, WARREN TRANSPORT, by and through its duly authorized agent, RICARDO GABRIEL JIMINEZ, breached its aforementioned duty in one or more of the following ways:

a) Carelessly and negligently operated, managed, maintained and controlled said vehicle;

b) Carelessly and negligently operated said motor vehicle at rate of speed that was greater than reasonable and proper with regard to traffic conditions and the use of the highway, contrary to, and in violation of, the provisions of 625 ILCS 5/11-601(a) of the Illinois Revised Statutes;

c) Carelessly and negligently operated said motor vehicle without keeping a proper and sufficient lookout for other vehicles in and about the area, and specifically for the motor vehicle operated by the Plaintiff;

d) Carelessly and negligently failed to operate his motor vehicle entirely within a single lane without first ascertaining that such movement could be made safely, contrary to, and in violation of the provisions of 625 ILCS 5/11-709 of the Illinois Revised Statutes;

e) Carelessly and negligently changed from one lane to another without first ascertaining that such movement could be done safely, contrary to and in violation of the provisions of 625 ILCS 5/11-709(a) of the Illinois Revised Statutes;

f) Carelessly and negligently failed to have said motor vehicle equipped with proper and sufficient brakes, contrary to, and in violation of, the provisions of 625 ILCS 5/12-301(a) of the Illinois Revised Statutes;

g) Carelessly and negligently failed to give audible and proper warning of the approach of said motor vehicle, although such warning was necessary to insure the safe operation of said vehicle contrary to, and in violation of, the provisions of 625 ILCS 5/12-601(a) of the Illinois Revised Statutes;

h) Carelessly and negligently failed to maintain proper control over said motor vehicle at all times;

i) Carelessly and negligently failed to stop said motor vehicle when danger was imminent so as to avoid striking the Plaintiff's vehicle;

j) Carelessly and negligently failed to change the course of said motor vehicle so as to avoid striking the Plaintiff's vehicle; and/or

k)  Otherwise carelessly, negligently and improperly drove and operated
said motor vehicle.

8)      As a direct and proximate result of one or more of the aforesaid careless and

negligent acts, the vehicle being operated by the Defendant, RICARDO GABRIEL JIMINEZ,

collided with the vehicle operated by the Plaintiff, GHEORGHE CIOCAN, and as a direct and

proximate result of that collision the Plaintiff, GHEORGHE CIOCAN, suffered serious bodily

injury, both internally and externally, and he suffered a severe shock to his nervous system, and

became sick and disabled, and will continue to suffer great pain, discomfort and physical

impairment; and his said injuries required hospitalization and medical treatment, all of which said

injuries are permanent; and he has been kept from attending to his ordinary affairs and duties; and

he has lost large gains, and has become obligated for large sums of money for medical and hospital

care and attention.

WHEREFORE the Plaintiff, GHEORGHE CIOCAN, prays for judgment against the

Defendant, WARREN TRANSPORT, INC., in an amount greater than FIFTY THOUSAND

DOLLARS ($50,000.00) as will fairly, reasonably and adequately compensate him for his injuries

and damages, together with his costs in bringing this suit.

SCOTT L. SPIEGEL
ATTORNEY FOR PLAINTIFF

**ARDC NUMBER: 6275967**
**SPIEGEL & DEMARS**
**19 S. LASALLE STREET, SUITE 902**
**CHICAGO, IL 60603**
**(312) 726-3377**
**(312) 782-3366 (fax)**

## SUPREME COURT RULE 222(b) AFFIDAVIT

I, SCOTT L. SPIEGEL, an attorney being duly sworn on oath, deposes and states that the total amount of money damages sought in this matter is greater than $50,000.00.

SPIEGEL & DEMARS

SCOTT L. SPIEGEL

**SPIEGEL & DEMARS**
**19 S. LASALLE STREET, SUITE 902**
**CHICAGO, IL 60603**
**(312) 726-3377**
**(312) 782-3366 (fax)**

# ILLINOIS TRAFFIC CRASH REPORT

BP 1090 JANUARY 2009 (MCR)

Sheet 1 of 2 Sheets

ISP-4737-201-40310-233536

AGENCY CRASH REPORT NO.
*2243574744*

INVESTIGATING AGENCY
ILLINOIS STATE POLICE

**Unit 1**

NAME: JIMINEZ, RICARDO GABRIEL

STREET ADDRESS

CITY: LAREDO   STATE: TX

DRIVER/LICENSE NO.

OWNER NAME: JIMINEZ, RICARDO GABRIEL

CITY: LAREDO

MAKE: Freightliner   MODEL: Cert 120   YEAR: 2001

**Unit 2**

COUNTY: MARSHALL

TWP: BENNINGTON TWP

1 On-Scene   1 Injury

DATE OF CRASH: 03/10/2014

I-39 MILE POST 31

I-39 HIGHWAY or STREET NAME

PASSENGERS & WITNESSES ONLY (NAME, ADDR, TEL)

VEHICLE OWNER (LAST, FIRST, M.I.)
JIMINEZ, RICARDO GABRIEL

**Unit 1**

NAME: JIMINEZ, RICARDO GABRIEL
ARREST NAME: JIMINEZ RICARDO GABRIEL
OFFICER: JIMINEZ RICARDO GABRIEL   4737

PROPERTY OWNER ADDRESS (STREET, CITY, STATE, ZIP)

SECTION: Too fast for conditions   reduce
Improper overtaking

DAMAGED PROPERTY

CITATION NO. 7961395   CITATION NO. 7961395

DATE NOTIFIED: 03/10/2014   DATE: 04/21/2014

COURT DATE: 04/21/2014

PRIMARY: 4 Improper overtaking/passing
SECONDARY: 27 Exceeding safe speed for conditions

SIGNATURE

S7-4737-2014-0310-233556

## DIAGRAM

I-39 SOUTHBOUND

Not to Scale

N



## NARRATIVE (Refer to vehicle by Unit No.)

UNIT # 2 WAS SOUTHBOUND ON I-39 IN THE RIGHT LANE, 902 FEET SOUTH OF MILEPOST 31. UNIT # 1 WAS SOUTHBOUND ON I-39 BEHIND UNIT # 2. DRIVER OF UNIT # 2 STATED HE WAS TRAVELING APPROXIMATELY 50-55 MPH DUE TO THE HEAVY TRANSMISSION CASINGS HE WAS HAULING. DRIVER OF UNIT # 1 STATED HE WAS TRAVELING APPROXIMATELY 65 MPH. DRIVER OF UNIT # 1 ATTEMPTED TO PASS UNIT # 2, BUT DID NOT GET OVER TO THE LEFT LANE IN TIME. UNIT # 1 STRUCK UNIT # 2. DRIVER OF UNIT # 2 WAS TRANSPORTED TO CGSF ST JAMES HOSPITAL IN PONTIAC FOR TREATMENT. DRIVER OF UNIT # 1 REFUSED TREATMENT AT THE SCENE.

## LOCAL USE ONLY
Nothing

U1 Color: Blue

U0 Color: White

U1 Towed By / To: Senica Interstate Towing / Senica Interstate Towing

U2 Towed By / To: Mlowak Auto Body / Mlowak Auto Body

## COMMERCIAL VEHICLE

| | Unit 1 | |
|---|---|---|
| | | SOURCE |
| USDOT | GVWR | SIDE OF TRUCK |
| OR State No. | 80000 | PAPERS |
| | | DRIVER |
| | | LOG BOOK |

HAZARDOUS MATERIALS
IF YES: 4 DIGITS    1 DIGIT    PLACARDED? No

HAZARDOUS CARGO RELEASED FROM TRUCK? N

VIOLATION OF HAZMAT REGS. CONTRIBUTE TO CRASH? N

INSPECTION FROM COMPLETED? N

HAZMAT   N   OUT OF SERVICE? N

MCS   N   OUT OF SERVICE? N

IDOT PERMIT#

| | Wide/Load | N |
|---|---|---|
| TRAILER WIDTH(S) | TRAILER LENGTH(S) | FORM NO. |
| TRAILER 1 | TRAILER 1 | IL473700B111 |
| TRAILER 2 | TRAILER 2 | |

Vehicle Configuration   6    Cargo Body Type    Load Type

---

| USDOT | 001896 | State Name   IA | ICCMC 114211 | Unit 2 |
|---|---|---|---|---|
| OR State No. | | | | None |

HAZARDOUS MATERIALS
IF YES: 4 DIGITS    1 DIGIT    Name    PLACARDED? No

HAZARDOUS CARGO RELEASED FROM TRUCK? N

VIOLATION OF HAZMAT REGS. CONTRIBUTE TO CRASH? N

INSPECTION FROM COMPLETED? N

HAZMAT   N   OUT OF SERVICE? N

MCS   N   OUT OF SERVICE? N

| COMMERCIAL VEHICLE | | SOURCE |
|---|---|---|
| CARRIER NAME | | SIDE OF TRUCK |
| | | PAPERS |
| ADDRESS | | DRIVER |
| | | LOG BOOK |
| CITY | STATE | ZIP |

ID Number

USDOT

OR State No.    State Name    ICCMC    GVWR

MCS    None

HAZMAT

HAZARDOUS MATERIALS
IF YES: 4 DIGITS    1 DIGIT    Name    PLACARDED ?

HAZARDOUS CARGO RELEASED FROM TRUCK?

VIOLATION OF HAZMAT REGS. CONTRIBUTE TO CRASH?

INSPECTION FROM COMPLETED?

HAZMAT    OUT OF SERVICE?

MCS    OUT OF SERVICE?

DOT PERMIT#

| | Wide/Load | N |
|---|---|---|
| TRAILER WIDTH(S) | TRAILER LENGTH(S) | Vehicle Length |
| TRAILER 1   0-96" | TRAILER 1   53 | Total - Ft   65 |
| TRAILER 2 | TRAILER 2 | No Of Axles |

Vehicle Configuration   6    Cargo Body Type   2    Load Type   5

SP 1060 JANUARY 2009 (MCR)

# ILLINOIS TRAFFIC CRASH REPORT

Sheet 2 of 2 Sheets

ISP-4737-201-40310-233536

ILLINOIS STATE POLICE

INVESTIGATING AGENCY

| TRHD | TRFC | WEAT | DRVA | VIS | VIS | HWND | VEHO | LIGHT | COLL | MNV | MNVF | PPA | PPA | PPL | PPL |
| 12 | 4 | 1 | | | | | 4 | 11 | | | | | | | |

HIGHWAY or STREET NAME
I-39   138 MILE POST 31

COUNTY
MARSHALL

BENNINGTON TWP

TYPE OF REPORT
1 On-scene

TYPE OF CRASH
B Injury

AGENCY CRASH REPORT NO
06-14-00193

DATE OF CRASH
03/10/2014

*24357444*

| OFFICER ID | ARREST NAME | | CITATION NO | DATE NOTIFIED | TIME NOTIFIED | | |
| 4737 | JIMINEZ RICARDO GABRIEL | Motor Carrier Safety | 7961397 | 03/10/2014 | 09:26 | | |
| | SIGNATURE | SECTION | CITATION NO | COURT DATE | COURT TIME | | |
| | | | | 04/21/2014 | 09:00 | | |

ARREST NAME: JIMINEZ RICARDO GABRIEL

PRIMARY: 4 Improper overtaking/passing
SECONDARY: 27 Exceeding safe speed for conditions

CONTRIBUTORY CAUSE(S)

SP-4737-2014-03-10-233336

# DIAGRAM

## NO DIAGRAM

**NARRATIVE (Refer to vehicle by Unit No.)**

UNIT # 2 WAS SOUTHBOUND ON I-39 IN THE RIGHT LANE, 902 FEET SOUTH OF MILEPOST 31. UNIT # 1
WAS SOUTHBOUND ON I-39 BEHIND UNIT # 2. DRIVER OF UNIT # 2 STATED HE WAS TRAVELING
APPROXIMATELY 50-55 MPH DUE TO THE HEAVY TRANSMISSION CASINGS HE WAS HAULING. DRIVER OF
UNIT # 1 STATED HE WAS TRAVELING APPROXIMATELY 65 MPH. DRIVER OF UNIT # 1 STATED HE
ATTEMPTED TO PASS UNIT # 2, BUT DID NOT GET OVER TO THE LEFT LANE IN TIME. UNIT # 1 STRUCK
UNIT # 2. DRIVER OF UNIT # 2 WAS TRANSPORTED TO OSF ST JAMES HOSPITAL IN PONTIAC FOR
TREATMENT. DRIVER OF UNIT # 1 REFUSED TREATMENT AT THE SCENE.

**LOCAL USE ONLY**

---

## COMMERCIAL VEHICLE

CARRIER NAME

ADDRESS

| | | | SOURCE |
|---|---|---|---|
| CITY | STATE | ZIP | SIDE OF TRUCK |
| | | | PAPERS |
| | | | DRIVER |
| ID Number | | | LOG BOOK |
| USDOT | State Name | ICCMC | None |
| OR State No. | | GVWR | |

**HAZARDOUS MATERIALS**
IF YES, 4 DIGITS    1 DIGIT    Name:    PLACARDED ?

HAZARDOUS CARGO RELEASED FROM TRUCK?

VIOLATION OF HAZMAT REGS. CONTRIBUTE TO CRASH?

INSPECTION FROM COMPLETED?

HAZMAT            OUT OF SERVICE?

MCS              OUT OF SERVICE?

IDOT PERMIT#

| TRAILER WIDTH(S) | | TRAILER LENGTH(S) | Vehicle Length |
|---|---|---|---|
| | WideLoad | | |
| TRAILER 1 | | TRAILER 1 | Total - Ft. |
| TRAILER 2 | | TRAILER 2 | No. Of Axles |

Vehicle Configuration     Cargo Body Type     LoadType

FORM NO.

---

## COMMERCIAL VEHICLE

CARRIER NAME

ADDRESS

| | | | SOURCE |
|---|---|---|---|
| CITY | STATE | ZIP | SIDE OF TRUCK |
| | | | PAPERS |
| | | | DRIVER |
| ID Number: | | | LOG BOOK |
| USDOT | | GVWR | |
| OR State No. | State Name | ICCMC | |

**HAZARDOUS MATERIALS**
IF YES, 4 DIGITS    1 DIGIT    Name    PLACARDED?

HAZARDOUS CARGO RELEASED FROM TRUCK?

VIOLATION OF HAZMAT REGS. CONTRIBUTE TO CRASH?

INSPECTION FROM COMPLETED?

HAZMAT            OUT OF SERVICE?

MCS              OUT OF SERVICE?

IDOT PERMIT#

| TRAILER WIDTH(S) | | TRAILER LENGTH(S) | Vehicle Length |
|---|---|---|---|
| | WideLoad | | |
| TRAILER 1 | | TRAILER 1 | Total - Ft. |
| TRAILER 2 | | TRAILER 2 | No. Of Axles |

Vehicle Configuration     Cargo Body Type     LoadType

FORM NO.

## DECLARATION

STATE OF IOWA         )
                             ) ss.

BLACKHAWK COUNTY    )

      I, Benjamin Caughron, being first duly sworn upon oath, depose and state as follows:

1. I am the Safety Director of WARREN TRANSPORT, INC., and have been the Safety Director since 2013.

2. WARREN TRANSPORT, INC. is incorporated under the laws of the State of Nebraska.

3. The headquarters and principal place of business for WARREN TRANSPORT, INC. is located in Waterloo, Iowa.

4. WARREN TRANSPORT, INC. does have a terminal located in Moline, Illinois, but that terminal is not WARREN TRANSPORT, INC.'s principal place of business. Additionally, WARREN TRANSPORT, INC. is not incorporated under the laws of the State of Illinois.

5. RICARDO GABRIEL JIMINEZ is a former independent contractor, owner-operator who was leased to WARREN TRANSPORT, INC. A copy of the Independent Contractor Agreement between Jiminez and WARREN TRANSPORT, INC. is attached to this affidavit as Exhibit A. Jiminez resided in Laredo, Texas at the time of the accident.

FURTHER DECLARANT SAYETH NOT.

By: _____

CLARANT
Benjamin Caughron
(Safety Director for Warren Transport, Inc.)

I, Benjamin Caughron, declare under penalty of perjury that the foregoing is true and correct.

Jamin Caughron

Executed on _October 12th_, 2015



EXHIBIT
C

# WARREN TRANSPORT, INC.
## INDEPENDENT CONTRACTOR'S AGREEMENT

THIS   AGREEMENT,   made   and   entered   into   this **15th** day of, **June 2012** by and between WARREN TRANSPORT, INC., a corporation, with its principal office in the City of Waterloo, Iowa, hereinafter referred to as "CARRIER" and **Ricardo Jimenez**, an **individual** of ▮▮▮▮▮▮▮▮ City of **Laredo**, State of **TX**, hereinafter called "CONTRACTOR".

WITNESSETH:

WHEREAS, THE CARRIER is a for-hire motor carrier operating pursuant to authorities granted by the Interstate Commerce Commission and certain state and foreign regulatory bodies,

WHEREAS, CARRIER desires to augment its equipment by the use of independent contractors, with equipment and drivers,

WHEREAS, CONTRACTOR owns or controls certain motor vehicle(s) and other equipment suitable for the transportation of the type of commodities which CARRIER is called upon to transport; and

WHEREAS, CONTRACTOR, as an independent contractor, utilizes such motor vehicle(s) and other equipment in the transportation of freight pursuant to contract or other arrangements with motor carriers, shippers, receivers or others,

WHEREAS, CARRIER desires to utilize the services of CONTRACTOR in transporting shipments tendered to it, and

WHEREAS, CONTRACTOR desires to furnish his vehicle(s) and other equipment, with drivers, to transport such shipments;

NOW, THEREFORE, in consideration of the above premises and mutual promises, covenants, provisions, and conditions hereinafter contained, the parties hereto agree as follows:

1. During the existence of this contract, and provided CONTRACTOR is willing and able, CARRIER agrees to exert reasonable effort to provide CONTRACTOR with as much poundage of freight as is reasonably possible under the circumstances; provided, however, that this is not to be construed as an agreement by the CARRIER to furnish any specific number of loads or pounds of freight for the transportation by the CONTRACTOR at any particular time or any particular place. CONTRACTOR will furnish in transporting shipments tendered to CARRIER by shippers, consignees, or other persons, such motor vehicle(s) and other equipment described in Appendix "A", which is incorporated and made a part hereof. CONTRACTOR will perform such services between the points prescribed by said shippers, consignees, or other such persons.

1

(Rev. May 4, 2010)

*Exhibit A*
*to Caughron*
*Declaration*

2. Notwithstanding any other provision in this Agreement to the contrary, it is expressly understood and agreed by, and it is the intent of, CARRIER and CONTRACTOR, that CONTRACTOR is an independent contractor, and neither CONTRACTOR nor CONTRACTOR'S employees are employees of CARRIER. CONTRACTOR shall determine the methods, means and manner of performing services under this Agreement and CARRIER does not have the right to and will not control or endeavor to control the manner, or prescribe the method, of performing such services. CONTRACTOR shall be held responsible for results only.

3. CONTRACTOR at CONTRACTOR'S own expense shall employ all necessary drivers, drivers-helpers, laborers, or other persons (collectively referred to as "CONTRACTOR'S employees") necessary to perform CONTRACTOR'S services under this Agreement, and due to such employment and CONTRACTOR'S status as an independent contractor, shall be solely responsible for all aspects of such employment, including but not limited to the following.

   a.    payment of CONTRACTOR'S employees;

   b.    any withholdings, deductions and reports required in connection with such employment, including but not limited to withholding of income taxes, FICA taxes, unemployment compensation taxes and other similar taxes, and any reports or filings in connection therewith;

   c.    direction and control of such employees, including but not limited to selection, hiring, firing, supervision, direction, training, setting of wages, hours, working conditions and compensation, and resolving grievances and complaints; and

   d.    all other acts or omissions of such employees.

   All acts or omissions of CONTRACTOR'S employees or CONTRACTOR'S servants, representatives and agents shall be deemed to be acts or omissions of CONTRACTOR and CONTRACTOR shall be responsible therefore. CONTRACTOR shall indemnify and hold CARRIER harmless from any loss, damage or liability, including reasonable attorney's fees, court costs and other expenses, suffered or incurred as a result of any action of a governmental body or other person arising from or connected with any acts or omission of any of CONTRACTOR'S employees, servants, agents or representative or connected with CONTRACTOR'S relationship with such employees or with other persons or with CARRIER under any law or regulations relating to or dealing with the relationship between employers and employees, including but not limited to industrial accident and worker's compensation laws. Upon request, CONTRACTOR shall furnish the CARRIER satisfactory proof of payment and satisfactory proof of compliance with all applicable laws, rules, regulations and requests such as but not limited to the type described in this paragraph as well as the entire Agreement, including payment of foregoing taxes as well as all other taxes which CONTRACTOR may be requested to pay by law.

4. During the existence of this Contract, and in order to implement the provisions herein contained, it is agreed and understood that CONTRACTOR will furnish said equipment, and necessary drivers, drivers-helpers, and laborers, and furnish or cause to be furnished, all necessary documents or information as prescribed or required by all applicable laws, rules,

2                                        (Rev. May 4, 2010)

and regulations of all regulatory agencies of governmental divisions. CARRIER does not wish to, and will not be a party to, or aid and abet in the knowing violation of any applicable laws, rules or regulations, and any violation of any said laws, rules or regulations by CONTRACTOR shall be a basis for immediate termination of this agreement by CARRIER.

5. The CONTRACTOR as an incident to his performance of this contract shall pay or cause to be paid all costs and expense of such performance, including but not limited to:

    a. The costs of maintenance and operation of all vehicles furnished by him, including but not limited to, the costs of fuel, oil, tires, lubricants, garaging, repairs, and labor;

    b. Payment of all taxes, fees or tolls incidental to the ownership, use and operation of vehicles furnished by him including but not limited to, road and bridge tolls, fuel and mileage taxes, gross revenue taxes, road taxes, equipment use fees or taxes, and any other "third structure" or similar type of tax, unless otherwise specifically provided for herein; provided, however, that CONTRACTOR shall have the right to retain monies refunded for any unused portion of such taxes or fees as may be paid by CONTRACTOR; and provided further, that if state and federal regulatory agencies are required from time to time to return funds paid as taxes or fees, CONTRACTOR agrees that in such instances, such funds shall revert to CARRIER, whether or not CARRIER was instrumental in obtaining return of such funds.

    c. The cost of vehicle licenses and/or permits except overweight or over dimensional permits;

    d. Subject to the provisions of Subparagraph d of Paragraph 6 hereof, the costs of all fines imposed as a result of the operation of vehicles furnished by him or for any other cause;

    e. The costs of communications initiated by or requested by CONTRACTOR whether they be by mail, facsimile, telephone, or otherwise, and whether or not such communications are required by this Agreement;

    f. Any and all expenses incurred as a result of the detention of any equipment furnished by or to CONTRACTOR.

6. The CARRIER as incident to its performance of this contract, shall pay or cause to be paid, all costs and expenses of such performance, including but not limited to:

    a. The costs of communications initiated by CARRIER whether they are by mail, facsimile, telephone, or otherwise, and whether or not such communications are required by this Agreement;

    b. The costs of all physical maintenance and operation of any semi-trailer and/or accessorial equipment furnished to CONTRACTOR by CARRIER;

(Rev. May 4, 2010)

c. The costs of all yearly renewal fees imposed or assessed by any state or regulatory agencies on the authorities held by the CARRIER.

d. Except when caused by acts or omissions of CONTRACTOR as defined below, the costs of overweight and oversize fines when the trailers are pre-loaded, sealed or the load is containerized, or when the trailer or lading is otherwise outside the control of CONTRACTOR, and for improperly permitted over dimensional and overweight loads, and reimbursement of CONTRACTOR for any overweight or oversize fines paid by CONTRACTOR for which CONTRACTOR is not responsible. For the purposes of this subparagraph, "acts or omissions of CONTRACTOR" shall include but not be limited to the failure of CONTRACTOR:

    i. To have a load weighed at the time it is received by CONTRACTOR or as soon as possible thereafter, or at any time during transit that a violation could reasonably be expected to occur, to determine whether a violation of the overweight or properly permitted overweight laws has occurred or is reasonably expected to occur; and

    ii. To examine a load at the time of tender and during transit to determine whether a violation of the over dimensional or properly permitted over dimensional laws has occurred or is reasonably expected to occur, and in any such instance to take such steps as are necessary and appropriate to eliminate such violations or possible violations.

CONTRACTOR acknowledges that from time to time he has been, is and will be furnished information concerning the weight and over dimensional laws, that he is generally familiar with such laws, that he can obtain additional information concerning such laws at any time from the CARRIER and that he has the right to refuse to transport any load which he believes does or may violate the weight of over dimensional laws, and that any responsibility of CARRIER hereunder for overweight or oversize fines is solely in conformity with the Lease and Interchange of Vehicles Regulations of the Interstate Commerce Commission, 49 C.F.R. 1057 ("Leasing Regulations").

7. CARRIER shall, during the term of this Agreement as a service to CONTRACTOR and upon behalf of CONTRACTOR, renew CONTRACTOR'S license, permits, and registration, unless notified otherwise by CONTRACTOR prior to November 1 of year proceeding each license year. If CARRIER does not receive said notification by November 1, CONTRACTOR shall be responsible for the renewals as provided in Paragraph 5 of this Agreement. In all events, CONTRACTOR shall be responsible for payment of all fees and costs of such licenses, permits (except overweight and over dimensional permits) and registrations and any amount expended by CARRIER under the terms of this Agreement shall be charged back to CONTRACTOR. If CONTRACTOR is authorized to receive a refund or a credit for base plates purchased by CONTRACTOR from, and issued in the name of CARRIER, or if the base plates are authorized to be sold by CARRIER to another contractor, CARRIER upon request of CONTRACTOR shall refund to CONTRACTOR, on whose behalf the base plate was first obtained, a prorated share of the amount received, less any reasonable costs to the CARRIER in obtaining or making such refund and less any other amounts which CONTRACTOR may owe CARRIER under this Agreement.

(Rev. May 4, 2010)

8. In the event that CARRIER furnishes to CONTRACTOR a semi-trailer and/or accessorial equipment, whether owned or otherwise controlled by CARRIER for use in the performance of activities pursuant to this Agreement, CONTRACTOR shall be responsible and liable for all loss of or damage to any said semi-trailer and/or accessorial equipment occurring while in the possession or custody CONTRACTOR, excepting such loss or damage as CARRIER may be compensated for under any applicable insurance or otherwise, CONTRACTOR will indemnify CARRIER against any loss on account thereof.

9. CONTRACTOR is not required to purchase or rent any products, equipment or services from CARRIER as a condition of entering into this Agreement. CARRIER shall only pay for the deduct from CONTRACTOR'S compensation those items specifically, provided in this Agreement for which CONTRACTOR is obligated, including but not limited to licenses, permits and registrations, insurance and claims, or such other items as CONTRACTOR may specifically purchase or agree to purchase from CARRIER. Any settlement or other statement given by CARRIER to CONTRACTOR shall recite how the amount of each such item has been or will be computed; and CONTRACTOR shall be afforded copies of those documents, which are necessary to determine the validity of the charges. Nothing herein shall preclude CARRIER from requiring that its trailers and other accessorial equipment be used in the performance of transportation services by CONTRACTOR when those transportation services are performed on behalf of CARRIER, or that the motor vehicle(s) and other accessorial equipment furnished by CONTRACTOR are reasonably suited to perform the type of transportation services required under this Agreement and that they meet the safety and other requirements of the United States Department of Transportation and the States and Provinces in or through which CONTRACTOR operates or will operate.

10. CARRIER shall not be liable to CONTRACTOR for any loss of or damage to the vehicles and equipment furnished by CONTRACTOR hereunder or for any loss of time, or profits, or any other loss whatsoever unless caused by the intentional or grossly negligent acts of CARRIER'S employees acting within the scope of their employment, and in such latter event CARRIER will be liable only to the extent CONTRACTOR is not compensated for his loss or damage by insurance or otherwise. Further, CARRIER shall not be liable to CONTRACTOR for any damage or loss whatsoever incurred through any act or occurrence between two or more independent contractors contracting with CARRIER, or subleased there under. CONTRACTOR shall be responsible for the payment of premiums and any other cost of insuring the vehicles and equipment furnished by him against any loss or damage.

11. Pursuant solely to rules and regulations of the Interstate Commerce Commission or other regulatory agencies, the CARRIER will, as a motor carrier provide:

   a. Public liability and property damage insurance coverage as concerns shippers and the general public covering vehicles furnished by CONTRACTOR while in performance of the provisions of this Agreement in limits no less than those required by the Interstate Commerce Commission or other regulatory agencies; provided however, CONTRACTOR shall indemnify and be liable to CARRIER for any loss or damage to the third persons or their property up to Two Hundred Dollars ($200.00) for each accident for which CONTRACTOR is responsible. CARRIER shall retain the exclusive right to investigate each accident and make the determination as to whether or not CONTRACTOR is responsible for each accident.

(Rev. February 28, 2011)

b. Cargo insurance for loss of and damage to the property transported in or by the vehicles furnished by CONTRACTOR in limits no less than those required by the Interstate Commerce Commission or other regulatory agencies. CONTRACTOR will reimburse CARRIER for the cost of any claim for loss or damage of cargo occurring while same is in CONTRACTOR'S custody or possession under the provisions of this Agreement, as follows:

    i. Where the loss or damage occurs as a result of an accident of any type whatsoever involving CONTRACTOR'S equipment and/or trailer furnished by CARRIER while in the custody of the CONTRACTOR, or as a result of a cargo being transported by CONTRACTOR coming into contact with any object whatsoever or as a result of the cargo being transported by CONTRACTOR being dislodged, in any manner whatsoever, from the vehicle or combination of vehicles in the custody of the CONTRACTOR and upon which said cargo is being transported, CONTRACTOR will be responsible for an amount not to exceed One Thousand Dollars ($1,000.00) for each claim in connection with the shipment.

    ii. In the event of loss or damage occurring for any reason other than stated in Subparagraph (b) (i) above, such as, but not limited to, theft or pilferage, then CONTRACTOR will be responsible for the entire amount of loss or damage other than for such amounts as may be recovered by CARRIER under cargo or other insurance. CARRIER will notify CONTRACTOR of any claim for which he may be deemed liable, and CONTRACTOR shall have the opportunity to clear himself of the liability in connection therewith.

CARRIER shall provide the CONTRACTOR with a written explanation and itemization of any deductions for cargo or property damage made from any compensation or monies owed to CONTRACTOR.

12. CONTRACTOR will carry bobtail insurance with respect to public liability and property damage in the minimum amount of $500,000/$500,000/$500,000 covering the motor vehicles included as a part of this Agreement while not performing a trip under this Agreement. CONTRACTOR will furnish a certificate of insurance, or the equivalent issued by the insurance carrier, which will provide, among other things, for CARRIER to be named as an additional insured under such policy and for written notification of CARRIER at least ten (10) days prior to cancellation.

CONTRACTOR shall not be required to purchase any insurance coverage from or through CARRIER. In the event that such insurance is purchased from or through CARRIER, CARRIER will provide CONTRACTOR with a copy of each policy upon the written request of CONTRACTOR. When CONTRACTOR purchases such insurance in this manner, CARRIER will arrange for CONTRACTOR to be provided with a certificate of insurance, which shall include the name of the insurer, the policy number, the effective dates of the policy, the amounts and types of coverage, the cost to the CONTRACTOR for each type of coverage, and the deductible amount for each type of coverage for which CONTRACTOR may be liable.

13. CONTRACTOR assumes the risk of any injury to or death of himself or his employees,

(Rev. February 28, 2011)

resulting from performance of this Agreement, whether caused by third parties, CONTRACTOR'S own equipment or equipment furnished to him by CARRIER, or by the employees of CONTRACTOR or CARRIER unless caused by the international or grossly negligent acts of the CARRIER'S employees while acting within the scope of their employment.

14. It is expressly understood that because of CONTRACTOR'S status as an independent contractor, CARRIER cannot and will not carry any Workmen's Compensation insurance covering CONTRACTOR, and that CONTRACTOR shall be responsible for the payment of premiums on any health or accident insurance covering CONTRACTOR for his protection. In the event any state or other jurisdiction shall require CONTRACTOR to maintain Workmen's Compensation or any similar type of insurance, CONTRACTOR shall be required to obtain and pay for such insurance; and in the event CONTRACTOR shall fail to obtain and pay for any such required insurance, CONTRACTOR shall indemnify and hold CARRIER harmless from any loss, damage or injury resulting from such failure.

It is further expressly understood that it is the sole responsibility and liability of the CONTRACTOR to furnish Workmen's Compensation insurance for CONTRACTOR'S employees performing services pursuant to this Agreement, such as but not limited to drivers and driver-helpers. It is understood that CARRIER cannot and will not furnish Workmen's Compensation insurance for CONTRACTOR'S employees. CONTRACTOR shall furnish CARRIER with a certificate of insurance showing that all of CONTRACTOR'S employees are covered by Workmen's Compensation insurance and providing that CARRIER shall be notified at least ten (10) days prior to any cancellation or termination of said insurance.

15. Except when service is provided by a shipper, receiver or other person at no expense to CARRIER or as provided below, CONTRACTOR shall be responsible for loading or unloading any shipment transported or to be transported by CONTRACTOR. In the event CARRIER loads or unloads property transported or to be transported by CARRIER, CONTRACTOR shall be charged for the performance of such services on the basis of the schedule described in Appendix "B" attached to the Agreement, which is incorporated and made a part hereof by reference.

16. CONTRACTOR will collect and promptly remit to CARRIER all the amounts paid to CONTRACTOR by consignor(s) or consignee(s) for transportation charges or otherwise. CONTRACTOR will be liable for any amounts, which he fails to remit to CARRIER or fails to collect from consignor(s) or consignee(s) unless otherwise instructed. Nothing contained in any provisions of this Agreement shall be construed so as to make CARRIER or CONTRACTOR an agent for any purpose whatsoever.

17. CONTRACTOR shall deposit with CARRIER the sum of Three Hundred Dollars ($300.00) for the first motor vehicle and Two Hundred Dollars ($200.00) for each successive motor vehicle covered by this Agreement. Such deposit(s) shall be held by CARRIER in an escrow fund subject to the following conditions:

(Rev. February 28, 2011)

a.  The fund can be applied to any specific item in this Agreement under which CONTRACTOR has an obligation, and incurs a liability, to CARRIER.

b.  CARRIER shall account to CONTRACTOR on a monthly basis for any transaction involving the fund, either by indicating on individual sheets the amount and description of any deduction or addition made to the fund, or by providing a separate accounting to CONTRACTOR for any transaction involving the fund. CONTRACTOR shall have the right to demand an accounting for transactions involving the fund at any reasonable time.

c.  While the fund is under the control of CARRIER, CARRIER shall pay interest on the fund on a quarterly basis. For purposes of calculating the balance of the fund on which interest must be paid, CARRIER may deduct a sum equal to the average advance made to CONTRACTOR during the period of time for which interest is paid. The interest rate shall be established on the date the interest period begins and shall be based on the average yield or equivalent coupon yield on 91-day, 13 week Treasury bills as established in the weekly auction by the Department of Treasury or such other basis as may be prescribed by the Interstate Commerce Commission from time to time.

d.  The fund or any portion thereof for which CONTRACTOR is not obligated to CARRIER under this Agreement, including any advances to CONTRACTOR by CARRIER, shall be returned to CONTRACTOR within forty-five (45) days of the termination of this Agreement and a showing by CONTRACTOR or a determination by CARRIER that the amount in the fund exceeds any obligation which CONTRACTOR has to CARRIER under this Agreement. CARRIER shall make a final accounting of the fund to CONTRACTOR or all such final deductions made to the fund. If CONTRACTOR terminates this Agreement without giving the notice provided in Paragraph 27 hereof, CARRIER may retain the entire fund held for CONTRACTOR.

e.  Nothing in this paragraph shall preclude or prevent CARRIER from pursuing any remedies, which CARRIER may have against CONTRACTOR for any breaches or violations of this Agreement.

18.  Subject to the adjustments for the cost of fuel as provided in Appendix "C" attached to the Agreement, which is incorporated and made a part hereof by reference, CARRIER shall pay CONTRACTOR an amount equal to Sixty-Five Percent (65%) of the gross transportation revenue derived by CARRIER from the shipments transported by CONTRACTOR under the terms of this Agreement; (If this Agreement covers the furnishing of more than one (1) vehicle, the revenue percentages are set opposite vehicles description in Appendix "A" provided, however, that the revenue payable to CONTRACTOR hereunder for each unit trip shall, upon prior request of the CONTRACTOR, be subject to renegotiation upon completion of that unit trip, and if said revenue payable to CONTRACTOR shall be renegotiated upon completion of that unit trip, and if said revenue payable to CONTRACTOR shall be renegotiated, said renegotiated revenue shall be in effect of that unit trip only. In the event that CONTRACTOR and other independent contractors and other persons participate in the movement of the same shipment under conditions other than those described in Paragraph 19 below, the CONTRACTOR will be paid his percentage of this gross transportation revenue prorated on the basis of the CONTRACTOR'S participation in the movement of the shipment. CONTRACTOR shall be paid his share of the revenue for each load, which is processed through the main office of CARRIER, provided that CONTRACTOR has

(Rev. February 28, 2011)

submitted to CARRIER all collections and information required by any regulatory agency with respect to each of said loads and has returned all equipment furnished by CARRIER. Once each week, CARRIER will furnish CONTRACTOR with a statement of settlement and check for payments of all loads fully processed and not previously paid.  If requested by CONTRACTOR, prior to settlement time, the CARRIER may deliver to CONTRACTOR payment on revenue earned for which settlement and payment has not been made. CONTRACTOR may be charged the sum of Five Dollars ($5.00) for each pre-settlement payment made. CARRIER will have the right to make any adjustments arising from any previous loads transported by CONTRACTOR or any other debts or credits for which CONTRACTOR is liable or to which he is entitled.  CARRIER assumes no obligation to reimburse CONTRACTOR for any claims presented more than thirty (30) days after the date of settlement on any particular load.

19. In the event that CONTRACTOR willfully refuses to effect delivery of a shipment or fails to affect delivery because of a breakdown of CONTRACTOR'S equipment, illness or for any other similar reason, CARRIER reserves the right to use another independent contractor or other person as selected by the CARRIER, at CARRIER'S discretion, to affect such delivery. CARRIER further reserves the right to adjust the compensation of the original CONTRACTOR for the portion of the transportation performed by him as CARRIER judges befits the situation at hand.

20. CONTRACTOR is required to submit to CARRIER the following documents in connect with each shipment transported by CONTRACTOR:

    a.  Drivers' records of duty status (logs);

    b.  Delivery receipt and/or bill of lading;

    c.  Fuel receipts;

    d.  Vehicle condition reports;

    e.  Mileage report form;

    f.  Lease and Interchange agreements which may have been executed;

    g.  All documents, permits and receipts pertaining to operation on behalf of CARRIER including, but not limited to, over-dimensional permits, road and fuel tax receipts, and other documents required by state or federal agencies to be kept by CONTRACTOR or CARRIER or both in connection with the operation, maintenance or registration of motor vehicles or other equipment; and

    h.  Any other documents necessary for CARRIER to secure payment from the shipper.

In addition, CONTRACTOR shall submit monthly equipment maintenance reports to CARRIER by the tenth (10th) day of the month following the month for which the report is made. Settlement for each shipment transported by CONTRACTOR shall be made within fifteen (15) days of the receipt by CARRIER of the documents described in Subparagraphs a, b, f, and h above. CARRIER may withhold the tender of another shipment to

9

(Rev. February 28, 2011)

CONTRACTOR unless CONTRACTOR has provided all of documents described above within twenty (20) days of the delivery of a shipment. Such failure shall also be a basis for terminating this Agreement with cause. CARRIER shall give a copy of the rated freight bill to CONTRACTOR before or at the time of settlement. CONTRACTOR shall have the right to examine copies of CARRIER'S tariffs. CARRIER'S tariffs are available for examination at CARRIER'S home office in Waterloo, Iowa.

21. Nothing in this Agreement shall be construed as a guarantee that CARRIER will be able to supply CONTRACTOR with a "back haul". In the event CARRIER is unable to supply CONTRACTOR with a shipment, CONTRACTOR shall have the right to trip lease to another carrier. CONTRACTOR shall, prior to movement, notify CARRIER of any trip lease that CONTRACTOR has solicited in order for CARRIER to comply with the regulations of all regulatory agencies and CARRIER'S insurance companies. Payment for such trip leased shipments shall be Seventy-five Percent (75%) of CARRIER'S gross revenue, in accordance with the terms outlined in Article 18 of this Agreement, excepting the provisions of Appendix "C".

22. To enable CARRIER to conform with the requirements of regulatory agencies and CARRIER'S insurers, CONTRACTOR will notify CARRIER promptly, by telephone and confirmed in writing of any accident involving any vehicles furnished by CONTRACTOR while performing services under this Agreement, and, of any situation of occurrence which adversely affects or is likely to adversely affect the performances of services under this Agreement including, but not limited to, any damage to, loss of, or unreasonable delay in delivery of cargo in the custody or possession of CONTRACTOR. Failure to abide by the provisions of this article shall be the basis for termination of the Agreement with cause.

23. This Agreement, and the rights and privileges granted hereunder to CONTRACTOR, may not be sold, assigned, or transferred, in whole or in part, whether by operation of law or otherwise, without written consent of CARRIER.

24. CONTRACTOR will indemnify CARRIER for any loss, damage, or expense whatsoever which CARRIER may sustain or become liable for as a result of CONTRACTOR'S act or acts, or failure to act, as provided in the Agreement, except as such indemnification is otherwise specifically limited by other provisions of this Agreement.

25. Subject to the express Agreement of CONTRACTOR, CARRIER may enter into an arrangement with another carrier having certificated authority when the CONTRACTOR'S performance of this Agreement necessitates the utilization of the equipment described in Exhibit "A".

26. In the event either party violates any terms of this contract, the other party shall have the right to immediately terminate this contract. The waiver by one party hereof of any breach of this Agreement by the other party hereof shall not constitute a waiver respecting any such future or other breaches thereof by such other party.

27. Either party may terminate this Agreement by thirty (30) days written notice sent by registered mail to the other party of his intention to do so. This Agreement shall continue in force until its termination in accordance with the provisions of this contract.

28. CARRIER will provide all identification, which is required by any regulatory agency to be affixed to equipment furnished by the CONTRACTOR. CONTRACTOR is encouraged to identify his ownership of the vehicles and equipment supplied or furnished by him under the terms of this Agreement, on those pieces of equipment.

29. In the event of termination of this Agreement by either party:

   a. CONTRACTOR'S rights and privileges to use the name and registered design of CARRIER shall cease immediately. CONTRACTOR will immediately remove or obliterate, at his expense, from all of CONTRACTOR'S vehicles CARRIER'S numbers and the numbers and lettering identifying the Certificates and Permits granted to CARRIER by regulatory agencies, and CONTRACTOR will also remove or obliterate the name and design of CARRIER and any and all reference to the CARRIER from any vehicles owned by CONTRACTOR and from all other uses under this control. CONTRACTOR will return to CARRIER any equipment furnished by CARRIER in the same condition as when originally delivered to the CONTRACTOR excepting reasonable wear and tear. CONTRACTOR shall furnish proof of fulfilling the provisions of this subsection and all other provisions of this contract to the CARRIER. If CONTRACTOR fails to fulfill the provisions of this subsection CARRIER shall have the right to cause the provisions of this subsection to be carried out wherever the equipment may be found. CONTRACTOR hereby waives any recourse against CARRIER for such action and agrees to reimburse CARRIER for any costs and expenses arising out of CARRIER fulfilling the provisions of this subsection.

   b. CONTRACTOR will delivery to CARRIER any and all bills of lading and other forms, advertising materials, and literature obtained by CONTRACTOR and furnished by or through CARRIER, and any licenses, registration plates, identifying insignia, cards, or papers obtained by or on behalf of CARRIER in furtherance of the operation of CONTRACTOR'S vehicles pursuant to this Agreement. CONTRACTOR will also execute and deliver to CARRIER all documents and papers which may be required to effect a transfer of, or to secure from the regulatory agencies involved a refund for, such licenses and registrations, and upon failure or refusal of CONTRACTOR to cooperate promptly with CARRIER to effect such transfers or secure such refunds, CARRIER may at its option, charge to CONTRACTOR the amount of any refund to which CARRIER might otherwise be entitled, or the cost of replacing such items for their unexpired terms.

   c. CONTRACTOR will deliver to CARRIER all license and/or registration plates, permits, and authorities, door signs and identification numbers, fuel and cash cards, and qualification cards. Failure to deliver such items to CARRIER will result in indicated amounts being withheld from CONTRACTOR by CARRIER.

License and/or Registration Plates:          $500.00

Door Signs and Identification Numbers:       $500.00

Fuel and Cash Cards:                         $500.00

   In addition to the amounts specified above to be withheld from CONTRACTOR by CARRIER, the provisions of Paragraph 24 shall apply in the event of any failure of

(Rev. February 28, 2011)

CONTRACTOR under this subparagraph.

d. Except as otherwise provided in Paragraph 20 hereof, CARRIER shall have the right to defer partial or final settlement with CONTRACTOR until such times as CONTRACTOR shall have complied fully with all of the applicable provisions of this agreement, or to deduct the expenses to CARRIER of carrying out any of the above-described obligations.

30. In connection with any Addendums to this Agreement submitted to CONTRACTOR by CARRIER subsequent to the date of this Agreement, CONTRACTOR agrees that the provisions of any Addendum shall become a part of the Agreement and be in full force and effect within thirty (30) days after the receipt of the proposed Addendum by CONTRACTOR or at CONTRACTOR'S normal place of residence or business, if CONTRACTOR fails to return the executed Addendum or to indicate in writing his/her refusal to execute the Addendum within said thirty (30) day period.

31. This Agreement shall supersede, replace and take precedence over any prior agreement or agreements of similar character between the parties hereto.

32. It is expressly understood and agreed between the parties hereto that no verbal arrangements, understandings, or agreements of any kind or character inconsistent herewith have been or are entered into, and shall be further understood and agreed that all arrangements and agreements between the parties hereto are incorporated in this Agreement and that this Agreement, and all the provisions contained herein, shall be interpreted according to the laws of the State of Iowa and the United States of America.

33. It is expressly understood and agreed between the parties hereto that, in the event disputes arise between the parties relative to the application or interpretation of the provisions contained herein, and such disputes result in relief being sought in the courts, the laws of the State of Iowa shall govern said disputes and any and all resultant court actions must be filed and litigated in the County of Black Hawk, State of Iowa.

34. Solely in conformity with the requirements of the Leasing Regulations, CARRIER during the term of this Agreement shall:

a. Have exclusive possession, control and use the motor vehicle(s) and other equipment; and

b. Assume complete responsibility for the operation of motor vehicle(s) and other equipment.

Nothing in this paragraph is intended to change or changes the understanding, agreement or intent of CARRIER and CONTRACTOR that CONTRACTOR is an independent contractor or any of the undertakings or obligations of CONTRACTOR under this Agreement.

35. The following words and phrases, when used in this contract, shall, for the purpose of this contract, have the meanings respectively ascribed to them:

a. "Regulatory Agency" means anybody charged with the administration of legislation or

(Rev. February 28, 2011)

administrative rulings, including but not limited to, the Interstate Commerce Commission, Department of Transportation, and any federal agencies, state agencies, municipal agencies and foreign agencies.

b. "Gross Transportation Revenue" means freight revenue only and does not refer to escort charges, permit fees, surcharges, pass through charges, or any other charges incidental to the movement of the freight.

c. "Unit Trip" means a movement, of a leased vehicle, consisting of a loaded, revenue - generating portion, moving under a CARRIER pro-number, or a combination of consecutive such movements, and the subsequent empty, non-revenue-generating portion.

d. The word "he" or "him" or any derivation thereof referring to CONTRACTOR shall be construed to apply to a male or female individual or to a corporation, partnership or other form of business, as the context may apply.

CORPORATE SEAL

Dated: **June 15th, 2012**

ATTEST:

WARREN TRANSPORT, INC.



BY

menez

BY:

WITNESS:

**WATERLOO, IOWA**

(Address)

(Rev. February 28, 2011)

# A P P E N D I X  "A"

## LIST OF EQUIPMENT UNDER CONTRACT

| Date of Installation | Unit No. | Yr/Make | Serial No. | Axle | % Rev. | Date of Deletion |
|---|---|---|---|---|---|---|
| 6/15/2012 | 25406 | 2001 Frght | 1FUJBBCG91PH63240 | 3 | 65 | 3/14/2014 |

## RECEIPT OF CARRIER (LESSEE)

The undersigned Lessee hereby acknowledges receipt of the above equipment from Lessor under terms of lease at **8:00** AM/PM **CST,** **June 15th, 2012**
(Time Zone) (Date)



## RECEIPT OF OWNER (LESSOR)

The undersigned hereby acknowledges receipt of the above-described equipment from Lessee and termination of lease at _____AM/PM _____, _____.
(Time Zone)                                    (Date)

_____            _____
Signature of Owner – Lessor                            Signature of Above or Driver-Agent

# A P P E N D I X  "B"

## LOADING CHARGES

1.      Waterloo, Iowa – Ten Dollars ($10.00) per LTL Tractor, Twenty Dollars ($20.00) maximum per load.

2.      At any other terminal or place, the charge for loading assessed by CARRIER to the CONTRACTOR will not exceed Twenty Dollars ($20.00) per load.

3.      A load is defined by billed weight of 24,000 lbs. minimum weight.

Initialed:  X



14                                    (Rev. February 28, 2011)

# APPENDIX "C"

In a decision in Ex Parte No. 311 (Sub No.4) Modification of Motor Carrier Fuel Surcharge Program, the Interstate Commerce Commission established a program for compensating CONTRACTORS on a mileage basis for increased fuel costs and for allowing CARRIER to fold in fuel surcharges to their tariffs through increased rates. The decision further provided that the Agreement between the CARRIER and the CONTRACTOR could be modified to provide for one hundred percent (100%) retention by the CARRIER of any fuel related increases and that the non-fuel related percentage compensation of the CONTRACTOR could be based on the total revenue less any fuel related revenue.

In a decision in Central Forwarding, Inc. vs. Interstate Commerce Commission, 698 F.2d 1266, the United States Court of Appeals for the Fifth Circuit denied the Commission the authority to fix the compensation of CONTRACTOR as provided in Ex Parte No. 311 (Sub No.4) Modification of Motor Carrier Fuel Surcharge Program.

The provisions specified below, which are in accordance with the decisions outline above, have been in effect since 1983 and have served as an equitable basis for compensating the CONTRACTOR for increased fuel costs and of allocating fuel and non-fuel revenues between the CONTRACTOR and CARRIER. It is desired that the substance of these provisions continue in effect indefinitely until circumstances warrant their modification or elimination.

1. CARRIER shall compensate CONTRACTOR for the increased cost of fuel on the basis of eleven cents ($ .11) for each loaded mile transported and for empty miles determined on the basis of twenty percent (20%) of the loaded miles transported. Such miles shall be determined on the same basis as mileage is determined for rate-making purposes.

2. In consideration of such mileage compensation to CONTRACTOR for the increased cost of fuel, CARRIER shall retain that proportionate amount of the gross transportation revenue as defined in Paragraph 35(b) of the Agreement, not including any insurance or other similar surcharges ("gross transportation revenue"), attributable to the fuel related increases permitted by Ex Parte No. 311 (Sub No.4) Modification of Motor Carrier Fuel Surcharge Program.

3. In view of the mileage compensation to CONTRACTOR provided in Paragraph 1 above and the retention of revenue by CARRIER as provided in Paragraph 2 above, the percentage compensation to CONTRACTOR as provided in Paragraph 18 of the Agreement shall be determined on the basis of the gross transportation revenue less that proportionate amount of the gross transportation revenue attributable to the increases permitted by Ex Parte No. 311 (Sub No.4) Modification of Motor Carrier Fuel Surcharge Program.

4. CARRIER shall furnish to CONTRACTOR a copy of the freight bill or a computer-generated document covering the involved transportation showing (a) the amount of the gross transportation revenue charged to the shipper, (b) the revenue upon which the CONTRACTOR'S percentage compensation is based as described in Paragraph 3 above, and (c) the loaded, empty and total miles on which the compensation provided in Paragraph 1 above is based. Unless written objection is made to any of such figures within thirty (30) days of the furnishing of a copy of the freight bill or computer-generated document to CONTRACTOR, such objections are waived.

15                                                      (Rev. February 28, 2011)

## INDEPENDENT CONTRACTOR'S CERTIFICATE
## REGARDING WORKER'S COMPENSATION LIABILITY

This statement made by the undersigned on behalf of **Ricardo Jimenez**, an Independent Contractor ("CONTRACTOR") under contract to Warren Transport Inc., ("CARRIER"), pursuant to a written contract dated the **15th** day of **June 2012**, certifies that it is fully understood by said CONTRACTOR that it is THE SOLE RESPONSBILITY AND LIABILITY OF THE UNDERSIGNED TO FURNISH WORKER'S COMPENSATION INSURANCE FOR MY/OUR EMPLOYEES PERFORMING WORK PURSUANT TO SAID CONTRACT INCLUDING, BUT NOT LIMITED TO, TRUCK DRIVERS.

I fully understand that Warren Transport Inc., as CARRIER, cannot and will not furnish Worker's Compensation Insurance for my/our employees. It is further understood that it is the responsibility of said CONTRACTOR to furnish Warren Transport Inc., as CARRIER, with a certificate of insurance as proof of Worker's Compensation Insurance covering my/our employees, and to immediately notify Warren Transport Inc. should said insurance become delinquent or not in force.

Dated this **15th** day of **June 2012**.

CONTRACTOR: **Ricardo Jimenez**



By:

WITNESS:

16                              (Rev. February 28, 2011)

(This Page Intentionally Left Blank)

(Rev. February 28, 2011)

# ADDENDUM "A – 4"

The purpose of this Addendum "A-4" is to amend, by the addition, on a temporary basis, to the Independent Contractor's Agreement (hereinafter referred to as "Agreement") between Warren Transport, Inc. (hereinafter referred to as "CARRIER") and CONTRACTOR, of a Fuel Surcharge reimbursement program. The Fuel Surcharge set forth therein has been established by due process and under proper tariff and contract procedures.

In addition to and considered separately from Appendix "C", this Addendum "A-4" hereby sets forth that CARRIER shall compensate CONTRACTOR for the increased cost of fuel on the basis of a "pass-through" to the CONTRACTOR of the charges billed to the customer and specified on the freight bill as Fuel Surcharge, or FSC. It is hereby understood that the Fuel Surcharge, in most cases, will be based on a cents per mile application, in which case it will be billed to the customer, shown on the freight bill, and passed on to the CONTRACTOR as such. It is further understood that the amount of the Fuel Surcharge may vary depending on the type of commodity or other negotiated contract or tariff factors, and such Fuel Surcharge will, in the future, reflect any decrease or increase in the price of fuel and shall be lowered, raised, or terminated accordingly.

It is further understood that the Fuel Surcharge program set forth in this Addendum "A-4" is temporary in nature, is designed to help defray some of the increase in the price of fuel, and may be terminated or modified effective upon notice, or as reflected on the freight bill, or receipt of a memorandum or bulletin setting forth the date.

Dated:  **June 15th, 2012**

WARREN TRANSPORT, INC.



By: _____

CONTRACTOR

**Ricardo Jimenez**                    **25406**
(Print Name)                         (Unit No.)



X_____
                                     (Signature)

18                    (Rev. February 28, 2011)

## ADDENDUM "B-1"
## TO
## INDEPENDENT CONTRACTOR'S AGREEMENT

This Addendum "B-1" is hereby understood to supersede and replace Addendum "B", if Addendum "B" had been previously executed. Paragraph 18 of the Independent Contractor's Agreement (hereinafter referred to as the "Agreement") between Warren Transport, Inc. (hereinafter referred to as "CARRIER") and CONTRACTOR is amended by the addition of the following paragraph:

Notwithstanding the percentage payment provided in the first paragraph of Paragraph 18 but subject to the other provisions of the first paragraph of Paragraph 18, except the adjustment for the cost of fuel as provided in Appendix "C" attached to the Agreement, CARRIER shall pay CONTRACTOR an amount equal to Eighty-Five Percent (85%) of the gross transportation revenue derived by CARRIER from shipments of the exempt commodities described below or such other commodities as may be designated from time to time as provided below, irrespective of who solicits or secures the shipments:

| | |
|---|---|
| Cotton | Peat Moss |
| Dried fruit & vegetables Grain | Popcorn |
| Grain | Rice |
| Hay | Rock, lave |
| Newspaper inserts | Seed |
| Nuts | Watermelons |
| Onions | |

The list of exempt commodities described above and subject to the provisions of this Addendum may be modified or amended from time to time by written bulletin or memorandum to CONTRACTOR describing the modified or amended list of exempt commodities subject to this Addendum and the effective date of the modification or amendment.

Date: **June 15th, 2012**

WARREN TRANSPORT, INC.

**Ricardo Jimenez**
(Contractor)

**25406**
(Unit No.)

By: _____
(Signature)

19                                        (Rev. February 28, 2011)

**Chastain, Becky**

| | |
|---|---|
| **From:** | Koch, Bill |
| **Sent:** | Wednesday, August 26, 2015 5:59 PM |
| **To:** | EROMail |
| **Subject:** | FW: Gheorghe Ciocan; claim number H04590-L-722 |

Image to file

**From:** Scott Spiegel [mailto:scottspiegel@spiegeldemars.com]
**Sent:** Wednesday, August 26, 2015 5:41 PM
**To:** Koch, Bill
**Subject:** Gheorghe Ciocan; claim number H04590-L-722

Mr. Koch,

Please accept this as a response to your email from August 24 in which you extended an offer to settle in the amount of $100,000.00. My client does not wish to accept the offer at this time. However, I do have authority to reduce Mr. Ciocan's demand to $400,000.00. Please contact me with a response to the new demand.



Sincerely,
Scott Spiegel

1

